UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ARNOLDO ARREOLA-ALVARADO,

    Defendant.

Case No. 18-cr-20034

U.S. DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS [#19][1]

### I. INTRODUCTION

On January 18, 2018, a grand jury returned an indictment charging Defendant Arnoldo Arreola-Alvarado with Conspiracy to Possess with Intent to Distribute a Controlled Substance, and Possession of a Controlled Substance with Intent to Distribute, in violation of 21 U.S.C. §§ 846, 841. *See* ECF No. 1. Presently before the Court is Defendant's Motion to Suppress Evidence [#19], filed on February 15, 2021. Defendant seeks to suppress evidence the Government seized during a raid on his brother's home. ECF No. 19, PageID.83. The Government submitted its Response in Opposition on March 8, 2021. ECF No. 20, PageID.91. The Court conducted an evidentiary hearing in this matter a year later.

---

[1] The Court amends its May 19, 2022, Order and Opinion with Defendant's correct last name. No other alterations were made.

1

On April 5, 2022, the Court heard oral argument. After carefully considering the parties' arguments, the Court will GRANT Defendant's Motion to Suppress Evidence [#19].

## II. FACTUAL BACKGROUND

The present matter extends from a warrantless search the Government conducted on the home of Arnoldo's brother: Mario Arreola-Alvarado.[2] At approximately 11:30 p.m. on October 31, 2016, Government agents arrived at Mario's home in Pontiac, Michigan. *See United States v. Arreola-Alvarado*, No. 16-20748, 2017 U.S. Dist. LEXIS 86168, at *2 (E.D. Mich. June 6, 2017). Mario stayed there with his wife, Monica Arreola-Alvarado, who originally purchased the home. Without a search warrant and wearing military-style raid gear, the officers approached the Pontiac property "holding guns and shining flashlights" into the home's windows. *Id.* at *14.

Law enforcement announced themselves as "police" after knocking on the front door. ECF No. 20, PageID.94. Mario and Monica woke up and answered the door to speak with the officers. *Id.* The couple encountered "a police dominated atmosphere" with five DEA agents and a Michigan K9 unit at their front door, weapons unholstered and flashing lights on. *See Arreola-Alvarado*, 2017 U.S.

---

[2] The Court uses the Arreola-Alvarado family members' first names for clarity.

Dist. LEXIS 86168, at *14. The Government agents never informed the couple that they could decline consenting to the search. *Id.* at *15.

The two sides had an almost twenty-minute exchange before Mario and Monica allowed the officers to search the home's locked garage for contraband. *Id.* at *2. Inside the garage, government agents found an unlocked closet by the garage's rear. ECF No. 20, PageID.96. Within the closest stood a workbench with a hidden storage space inside. *Id.* There, the Government agents discovered seven kilograms of heroin and one kilogram of cocaine. *Id.*

Law enforcement arrested Mario that night, and a grand jury charged him with one count of Possession with Intent to Distribute a Controlled Substance, in violation of 21 U.S.C. § 841, nine days later. *See Arreola-Alvarado*, 2017 U.S. Dist. LEXIS 86168, at *2. However, the presiding judge granted Mario's motion to suppress evidence on June 6, 2017. *Id.* The court determined neither Mario nor Monica could freely give consent under the circumstances of the Government's warrantless search. *Id.* at *15 (finding the couple's consent "was granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right.") (quoting *Johnson v. United States*, 333 U.S. 10, 13 (1948)). Specifically, the heavy police presence and the couple's hesitation before stating their consent suggested the Government acted coercively. *Id.* at *15–*16. The court also concluded that the Government "impermissibly created exigent

circumstances to justify their warrantless entry" into the couple's home. *Id.* at *16. The search therefore violated Mario's Fourth Amendment protection from unlawful searches and seizures, and any evidence seized as a result could not be used against him. The Government dismissed Mario's charges on June 13, 2017.[3]

Just over six months later, a grand jury indicted Mario's brother, Arnoldo. *See* ECF No. 1. He now seeks to suppress the same evidence as Mario in the present action. *See* ECF No. 19, PageID.83. When the Government discovered the contraband hidden in the garage's closed workbench, Arnoldo was not present. *See generally Arreola-Alvarado*, 2017 U.S. Dist. LEXIS 86168. He never lived at Mario's home, but Arnoldo possessed the only other key to the garage. ECF No. 20, PageID.96. The brothers remodeled the garage together, including replacing its door and lock. They spent almost every day after work listening to music and drinking in the garage as well. *Id.* at PageID.97.

The brothers also worked together at the same construction company. As a result, Arnoldo kept construction tools in the garage, *Id.* at PageID.97, and even spent time alone there, to obtain tools for example. ECF No. 19, PageID.83. The Government disputes that Arnoldo spent time in the garage "all the time without [Mario's] authorization" and Monica allegedly never recalled seeing Arnoldo there

---

[3] Mario—who is a native Spanish speaker like his brother—made one English statement during this Court's March 8, 2022 evidentiary hearing: that he remains fearful of the Government to this day.

without his brother. ECF No. 20, PageID.98. But at the March 8, 2022 evidentiary hearing, the brothers explained that Arnoldo did occasionally enter the garage without Mario's express permission. The brothers even testified to Arnoldo's right to exclude others from the garage.

Arnoldo did not live with Mario. *Id.* Both Arnoldo and his family lived in another house nearby. *Id.* And Arnoldo does not suggest that he ever spent the night at Mario's home. *Id.* But the two brothers were best friends; at least until the Government's raid. In addition to spending time together at work and after work, the brothers also hosted family parties in the garage. Arnoldo even held his daughter's baby shower there. These parties were always family affairs, both brothers expressed at the March 8, 2022 hearing, so they felt comfortable inviting family into their space.

### III. LAW AND ANALYSIS

Arnoldo argues he possesses Fourth Amendment standing to challenge the Government's search of the garage. People with a "legitimate expectation of privacy" in the place invaded have standing to challenge a Government search under the Fourth Amendment. *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978). Courts engage in a two-part inquiry when determining whether someone possesses a legitimate expectation of privacy. First, courts ask if the party seeking Fourth

5

Amendment protections "exhibited an actual expectation of privacy" in the place searched, such that "he has shown that he sought to preserve something as private." *United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005) (citation omitted). Second, courts decide "whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable." *Id.* Notably, courts weigh Fourth Amendment standing claims "on a 'case-by-case basis'" due to their fact specific nature. *Id.* (quoting *United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000)).

If Arnoldo has standing, he can assert the same challenge to the Government's unlawful search as his brother. The burden of showing a reasonable expectation of privacy in the garage falls on Arnoldo. *See Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

### A. Subjective Expectation of Privacy

As a threshold matter, the Court finds that Arnoldo possessed a subjective expectation of privacy in the garage. Mario shared the only other key to the garage with Arnoldo. Both brothers shared construction tools there as well, and other construction supplies for their business. The brothers also installed the garage's lock together and kept the side-door always locked. *See, e.g.*, *United States v. Etchison*, No. 05-CR-80180, 2005 U.S. Dist. LEXIS 30270, at *14 (E.D. Mich. Nov. 17, 2005) ("Defendant [] had a subjective expectation of privacy" where the place "contained his … personal effects" and the defendant "took normal

6

precautions to ensure his privacy[.]"). By storing personal property in the garage, helping install the garage's door and lock, and possessing one of two keys, Arnoldo's conduct sufficiently exhibits "an actual expectation of privacy" in the garage. *See Waller*, 426 F.3d at 844; *see also King*, 227 F.3d at 744 ("Defendant exhibited an actual subjective expectation of privacy in the basement by hiding cocaine there.") (citing *United States v. Bailey*, 628 F.2d 938, 943–44 (6th Cir. 1980)). The Court therefore finds Arnoldo exhibited an expectation of privacy.

### B. Reasonableness of Arnoldo's Expectation of Privacy

The next question is whether Arnoldo's expectation of privacy is reasonable. To answer that, the Court will first outline the parameters of Fourth Amendment standing. Then the Court will discuss whether Arnoldo's expectation of privacy was reasonable.

#### 1. Legal Standard

Fourth Amendment protections are personal rights because the Amendment guarantees "[t]he right of the people to be secure in *their* persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV (emphasis added). While "[t]he text of the Amendment suggests that its protections extend only to people in 'their' houses[,]" an individual "may have a legitimate expectation of privacy in the house of someone else." *Minnesota v.*

7

*Carter*, 525 U.S. 83, 89 (1998). Longstanding Supreme Court precedent has extended legitimate expectations of privacy to relatives of homeowners who regularly stay at a residence. *See Bumper v. North Carolina*, 391 U.S. 543, 548, n.11 (1968). Likewise, a homeowner's overnight guests enjoy expectations of privacy too. *See Minnesota v. Olson*, 495 U.S. 91, 98 (1990). Even non-overnight guests can possess legitimate privacy expectations. *Jones v. United States*, 362 U.S. 257, 259 (1960). Whether someone enjoys control—either shared or exclusively—over the space where the expectation of privacy exists is one critical factor. *Olson*, 495 U.S. at 99.

While the Fourth Amendment's protections are broad, they are also limited. "[S]uppression of the product of a Fourth Amendment violation can be successfully urged *only* by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman v. United States*, 394 U.S. 165, 171–72 (1969) (emphasis added). A defendant asserting a Fourth Amendment violation must therefore establish that "his own" rights were "infringed." *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018). The Amendment's applicability depends on "whether the person who claims the protection … has a legitimate expectation of privacy in the invaded place." *Carter*, 525 U.S. at 88 (quoting *Rakas*, 439 U.S. at 143). In other words, defendants must establish "the requisite connection to [a] place" before the Fourth

8

Amendment's shield can apply. *See Carter*, 525 U.S. at 99 (Kennedy, J., concurring).

Legitimate expectations of privacy do not attach to every visitor. Simply being "present with the consent of the householder" does not create the privacy interest. *See Carter*, 525 U.S. at 90.[4] For example, the visitors in *Carter* were "essentially present for a business transaction" and thus had no legitimate expectation of privacy in a third-party's apartment. *Id.* at 90. The Supreme Court emphasized that the defendants' lack of any "previous relationship" with the premises denoted the "degree of acceptance into the household." *Id.*

*Carter* also helped distinguish levels of privacy expectations between property used for residential and commercial purposes. 525 U.S. at 90 ("An expectation of privacy in commercial premises [] is different from, and indeed less than, a similar expectation in an individual's home.") (quoting *New York v. Burger*, 482 U.S. 691, 700 (1987)). The Supreme Court explained:

> [T]he purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between the respondents and the householder, all

---

[4] In *Carter*, an officer peered through an apartment window and observed the defendants packaging cocaine in someone else's apartment with the resident's consent and presence. 525 U.S. at 85. Following their arrest, the defendants moved to suppress the evidence seized on the grounds that the peering officer conducted an unconstitutional search. *Id.* The Supreme Court concluded the defendants had no reasonable expectation of privacy in the apartment because it was not their home, and they only used it "for commercial purposes." *Id.* at 90.

9

>lead us to conclude that respondent's situation is closer to that of one simply permitted on the premises.

*Carter*, 525 U.S. at 91. The Supreme Court previously repudiated the idea that mere presence on a property is sufficient to assert Fourth Amendment standing. *See Rakas*, 439 U.S. at 141–42. Accordingly, *Carter* further elaborated on the factors courts use to decide whether someone can claim Fourth Amendment protections.

Contrasting *Olson* with *Carter* helps clarify the principle underlying who has standing to argue Fourth Amendment challenges from unlawful searches. In *Olson*, the Supreme Court "recognize[d] that a houseguest has a legitimate expectation of privacy in his host's home." *See Olson*, 495 U.S. at 98. This holding can apply to a garage shared between brothers—"a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable." *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). While a transitory business guest has no special relationship with a space to suggest an expectation of privacy exists, *Carter*, 545 U.S. at 91, house guests and family members have such a relationship.

This distinction between social guests or family members (residential purposes), and business guests (commercial purposes), draws on the fact that social hosts share both their home and privacy with their guests. *See Olson*, 495 U.S. at 99. Social guests entrust their hosts with the security and safety of their

10

belongings, and person. For example, an overnight guest shelters in a home "precisely because it provides him with privacy, a place where he and his possessions will not be disturbed." *Id.* Business visitors are not treated similarly. People in business may not act out of privacy expectations and can even be complete strangers. Unlike sharing a residential space with family, expanding constitutionally protected privacy interests in commercial settings does not align with "the everyday expectations of privacy that we all share" in most circumstances. *See id.* at 98; *but see O'Connor v. Ortega*, 480 U.S. 709, 716 (1987) (recognizing "that employees may have a reasonable expectation of privacy" in "the workplace context.").

Both parties here agree on the settled rule: that the expectation of privacy must be one that society recognizes as reasonable. *See Katz*, 389 U.S. at 361 (Harlan, J., concurring). What society considers reasonable depends on who the individual is, where the individual claims their privacy interest, and what expectations of privacy are traditionally recognized there. *See Carter*, 525 U.S. at 102 (Kennedy, J., concurring). In *Waller*, the Sixth Circuit discussed several factors that help courts determine whether a legitimate expectation of privacy exists:

> The person's proprietary or possessory interest in that place to be searched or item to be seized; whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited

11

> a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises.

426 F.3d at 844 (citations omitted). Considering the precedent discussed above and the *Waller* factors, the Court analyzes Arnoldo's case below.

### 2. Discussion

Arnoldo argues his expectation of privacy in the garage was reasonable. He and Mario were the only people to possess keys to the garage. Even Mario's wife Monica did not have a key. The brothers remodeled the garage together and socialized there after their construction shifts, sharing beer while listening to music. Arnoldo could spend time alone in the garage because he possessed a key, and stored tools there as well. The two brothers had parties in the garage, including Arnoldo's daughter's baby shower. The time Arnoldo spent in the garage reflects the "familial tie" he and his brother shared there. *See United States v. Heath*, 259 F.3d 522, 533 (6th Cir. 2001).

The Government contends that Arnoldo's lack of total control over the garage diminishes his claimed "possessory interest" in it. ECF No. 20, PageID.99. But "ultimate control of the [premises] is not inconsistent with the guest having a legitimate expectation of privacy." *Olson*, 495 U.S. at 99. As the Supreme Court stated:

> [H]osts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household.

*Id.* Arnoldo's lack of legal authority over the garage is therefore not dispositive to his claim. *See United States v. Mills*, 372 F. Supp. 517, 539–40 (E.D. Mich. Apr. 5, 2019) (citing *King*, 227 F.3d at 744). By providing him the only other key, Mario shared his expectation of privacy with Arnoldo, including the "ability to exclude others" that no one else—not even Mario's wife—had. *See Heath*, 259 F.3d at 533 (recognizing a key "allowed [defendant] unfettered access to the apartment and the ability to admit and exclude others."). Unlike a pizza delivery boy or a party guest at Mario's summer socials, the key allowed Arnoldo to come and go from the garage as he pleased. The key also permitted Arnoldo to exclude others from the garage by locking the door behind him. The brothers did not need to share the garage equally for Arnoldo's possessory interest to exist. *See Olson*, 495 U.S. at 98–99. Mario giving Arnoldo a key did just that.

Merely possessing a key to a house or garage is insufficient as a stand-alone for Fourth Amendment standing purposes. *See United States v. Anderson*, 273 F. Supp. 2d 921, 931 (E.D. Mich. July 22, 2003) ("It is clear that Defendant did not possess the key for the purpose of excluding others from the house."). In *Anderson*, the defendant had a key for the sole purpose of returning it to a landlord.

13

Here, Arnoldo had authority to keep possessions in the garage, enter the garage without asking for permission, and spent most days after work in the garage. Arnoldo possessing the key is more akin to the defendant in *Jones*, 362 U.S. at 259, who also had a key and kept clothes at a friend's apartment while sleeping there "maybe a night." The Supreme Court held that the defendant in *Jones* had standing to assert Fourth Amendment protections. *Id.*

Arnoldo retaining the key after Mario discovered the contraband also supports the reasonableness of Arnoldo's privacy expectation in the garage. It is unclear when, if ever, Mario changed the locks or requested his key back. Yet the parties agree that after Mario discovered drugs in the workbench, the brothers continued sharing the garage together. Arnoldo's continued use of the garage for storage also indicates "acceptance into the household" such that privacy was recognized. *Carter*, 525 at 90. That acceptance is strengthened by the brother's "familial tie" that "predates the [garage's] use for illegal conduct." *See Heath*, 259 F.3d at 533; *see also Bumper*, 391 U.S. at 544–48. Given these circumstances, the Court finds Arnoldo maintained authority to exclude others from the garage.

Next, the Government suggests Arnoldo's use of the garage and workbench were limited to commercial purposes. It cites *United States v. Macias-Treviso*, 42 F. Supp. 2d 1206, 1212 (D.N.M. 1999) in support, where a defendant also shared a garage with his brother. The defendant in *Marcias-Treviso* possessed the only key

14

to a home's garage that the brothers were building. *Id.* The court denied the defendant's motion to suppress, referencing "the purely commercial nature" of his use for the garage. *Id.* (quoting *Carter*, 525 U.S. at 91). The court also took issue with the defendant's lack of time spent overnight on the property. *Id.*

The Government's reliance on *Marcias-Treviso* is misplaced. First, Arnoldo did not use the garage for "purely commercial" purposes. *Carter*, 525 U.S. at 91. Activities like family celebrations and sharing beers on a couch do not reflect "[p]roperty used for commercial purposes" like the garage in *Marcias-Treviso*. 42 F. Supp. 2d at 1212 ("testif[ying] that [defendant] used the garage to do auto mechanics[.]") (quotation marks omitted). Second, Sixth Circuit precedent since *Marcias-Treviso* guides this Court differently. Courts in this Circuit have recognized "familial ties" between a homeowner and defendant are distinct from commercial connections, due to family relationships' long-running nature. *See Heath*, 259 F.3d at 533; *see also United States v. Haynes*, 108 F. App'x 372, 375 (6th Cir. 2004) (suggesting "any indications of acceptance into the household" is necessary for a legitimate expectation of privacy to exist). The rationale for treating family relationships differently is rooted in the principal *Olson* and *Carter* espouse: that an individual's connection to the space is what matters. *Olson*, 495 U.S. at 99; *Carter*, 525 U.S. at 90.

Courts in this district have previously recognized the significance a defendant's familial relationship has. In *United States v. Delgado*, 121 F. Supp. 2d 631 (E.D. Mich. 2000), a defendant claimed a reasonable expectation of privacy in his grandparents' home. Although the defendant did not live there, the home was open to him and he stayed there occasionally. *Id.* at 639. The Court explained:

> Delgado has manifested a subjective expectation of privacy in the home—*i.e.*, in the premises that were searched. Moreover, his relationship to those premises was substantial. He was not a transient and certainly enjoyed more than the privileges of an overnight guest. The affidavit suggests that the residence was a second home for him. If society recognizes and values the privacy of a house guest, as the Supreme Court held in *Olson*, then it is beyond peradventure that a grandchild's refuge in the home of his grandparents 'is a long-standing social custom that serves functions recognized as valuable by society.

121 F. Supp. 2d at 639 (citations omitted). The importance of familial ties to a space was also discussed in *United States v. Mapp*, where the court recognized a non-custodial parent's standing to assert Fourth Amendment privacy protections in his children's home. No. 05-80494, 2006 U.S. Dist. LEXIS 5624, at *17 (E.D. Mich. Jan. 30, 2006). The *Mapp* defendant had a key to his children's home and could visit the property at his leisure: just like Arnoldo. *Id.* Notable here, the defendant was not present when the search occurred. *Id.* at *10.

The Government also suggests that Arnoldo's absence during the search diminishes his privacy interest. That proposition is incorrect. In *Waller*, the Sixth Circuit recognized a transient defendant's legitimate expectation of privacy in his

16

bag. 426 F.3d at 845. Law enforcement arrested the defendant outside his apartment building, then searched his shared apartment unit and bag within, without the defendant present. *Id.* at 844–45. As such, an individual's privacy interest does not change based on their proximity to the space where an expectation of privacy is claimed. The Government's argument here falls short as well.

Finally, the fact that Arnoldo never stayed overnight in the garage does not bar his ability to assert Fourth Amendment privacy protections. *See United States v. Washington*, 573 F.3d 279, 283 (6th Cir. 2009) (extending Fourth Amendment "standing to challenge a search to non-overnight guests who are permitted to keep items in the residence.") (citing *Waller*, 426 F.3d at 844). The Supreme Court in *Carter* declined to limit Fourth Amendment standing to "overnight guests," by explicitly referencing connections "*similar* to the overnight guest relationship in *Olson*." 525 U.S. at 90 (emphasis added). Thus, being an overnight guest is one factor courts consider, but it is not dispositive. *See Washington*, 573 F.3d at 283. The *act* of sleeping at another's home is not what creates the privacy expectation; it is the *trust* a host affords their guest that the act symbolizes. *See Carter*, 525 U.S. at 90. The Fourth Amendment standing factors,[5] discussed *supra*, are what

---

[5] Those factors are: (1) "whether the defendant has a possessory interest in the … place searched," (2) "whether he has the right to exclude others from that place," (3) "whether he has exhibited a subjective expectation that it would remain free from government invasion," (4) "whether he took normal precautions to maintain

help courts decide whether trust exists between the host and guest. Trust is what undergirds the "expectation of privacy" that "society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361 (Harlan, J., concurring). A child *trusts* the security they enjoy from government intrusion in their guardian's home. *See Bumper*, 391 U.S. at 544–48. A social guest *trusts* that they remain free from unwarranted seizures while a host houses them. *See Olson*, 495 U.S. at 98. Even employees can *trust* that their office will enjoy reasonable expectations of privacy in limited circumstances, despite not sleeping there. *See O'Connor*, 480 U.S. at 717–18. So too can brothers trust that their privacy will remain protected from unlawful searches in a space they shared—and built—together.

In sum, the Court finds that Arnoldo satisfies his burden demonstrating that his legitimate privacy interest in the garage is reasonable.[6] As Mario's brother,

---

his privacy and" (5) "whether he was legitimately on the premises." *See Delgado*, 121 F. Supp. 2d at 637.

[6] Even under more rigid standards, *see Carter*, 525 U.S. at 91–93 (Scalia, J., concurring), Arnoldo has standing to assert the Fourth Amendment. In his concurrence, Justice Scalia advocated for a narrower interpretation of "houses" within the Fourth Amendment, and a departure from the *Katz* test entirely in these circumstances. *Id.* at 97 (Scalia, J., concurring) ("When [the] test is employed … to determine whether a 'search or seizure' within the meaning of the Constitution has *occurred* (as opposed to whether that 'search or seizure' is an 'unreasonable' one), it has no plausible foundation in the text of the Fourth Amendment.") (emphasis in original). Arnoldo's conduct reflects he used Mario's garage as a shared "house" with his brother, as evidenced by his residential use discussed above. *See supra* Section III.B.2. Thus, even under the narrowest test—which is not the law—Arnoldo still possessed Fourth Amendment standing to challenge the Government's unconstitutional search of the garage.

holder of the only other key, and by keeping personal property in the garage, Arnoldo establishes his privacy interest in that space. Accordingly, Arnoldo possesses standing to assert his Fourth Amendment reasonable expectation of privacy. Because the search and seizure has previously been determined a Fourth Amendment violation as well, the Court will GRANT Defendant's Motion to Suppress Evidence [#19].

### IV. Conclusion

For the foregoing reasons, the Court will GRANT Defendant's Motion to Suppress [#19].

**IT IS SO ORDERED.**

Dated: May 20, 2022          /s/ Gershwin A. Drain
                                       GERSHWIN A. DRAIN
                                       UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
May 20, 2022, by electronic and/or ordinary mail.
/s/ D. Tofil for Teresa McGovern
Case Manager